**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Raymond M. FREITAS, Walter Freitas, and Jonny E. McClellan, Defendants-Appellees.**

No. 85–1279.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 15, 1986.

Decided Sept. 26, 1986.

**1452**

Sanford Svetcov, Asst. U.S. Atty., Chief, Appellate Section, San Francisco, Cal., for plaintiff-appellant.

Penelope Cooper, Berkeley, Cal., for defendants-appellees.

Before SNEED, ANDERSON, and POOLE, Circuit Judges.

SNEED, Circuit Judge:

Raymond Freitas was charged with possession of a controlled substance with intent to manufacture and to distribute and with conspiracy to manufacture in violation of 21 U.S.C. §§ 841(a)(1) and 846. The government appeals from the district court's order suppressing evidence of drug-related activity, 610 F.Supp. 1560. We reverse the district court and remand for further proceedings consistent with this opinion.

## I.

### FACTS AND PROCEEDINGS BELOW

On July 27, 1984, an anonymous informant telephoned the Drug Enforcement Agency (DEA) and indicated that Raymond Freitas was running a methamphetamine laboratory at his home in Clearlake, California. Sometime in mid-August, the same informant told the DEA that Freitas also had a home in Oakland and that he used a GMC Blazer truck to transport chemicals and glassware to the laboratory. Given Freitas' background—his May 1980 arrest for importing seven pounds of cocaine and his January 1982 arrest for attempting to involve his brother-in-law in a methamphetamine-making scheme—the informant's tips added to the picture of Freitas as someone who was not unfamiliar with drugs. In October 1984, sheriffs around Clearlake notified the DEA that hoses ran from Freitas' house to the lake and that neighbors had noticed strong odors around the house. Both the odors and the hoses are signs of a methamphetamine laboratory. The anonymous informant phoned DEA agents twice in November, telling them that Freitas would probably begin producing methamphetamine soon, and phoned twice in December, telling them

that the drug-making operation would occur either at Freitas' home in Clearlake or at a location north of Sacramento.

On December 9, 1984, the informant called again and told the agency that Freitas was loading equipment for the manufacture of methamphetamine; this information jibed with the observations that DEA agents made the same day when they followed Freitas. On Freitas' trip to his home that day, one of the people in his entourage stopped at a grocery store and bought large blocks of ice, which are also used in the manufacture of methamphetamine. Two days later, someone in Freitas' party bought even more ice. Agents observed that the windows on the ground floor of the house were covered and that a hose ran from the house to the lake.

On the basis of this information, DEA special agent Stephen Wood applied to a magistrate for eight search warrants on December 12, 1984. One warrant permitted agents to search Freitas' Clearlake home, one warrant permitted them to search his Oakland home, and six warrants permitted them to search some storage lockers. The warrants were to be executed by December 16, 1984. On December 13, 1984, special agent Laura Hayes applied for a new search warrant—the so-called "surreptitious entry" warrant—for the Clearlake house. Hayes evidently believed that the defendants were in the middle of what would be an ongoing drug operation and that a surreptitious entry would help the DEA "determine the status of the suspected clandestine methamphetamine laboratory." 1 Excerpt of Record (E.R.) at 115. Under the terms of this warrant, the agents were permitted to enter the home while no one else was there, look around, and leave without removing anything. The magistrate, in issuing the warrant, used a conventional warrant form, designed to comply with Rule 41, Fed.R.Crim.P., but crossed off two items: first, the description of property to be seized, and second, the

requirement that copies of the warrant and an inventory of the property taken were to be left at the residence. The warrant contained no notice requirement. Agents executed the warrant on December 13, 1984, at approximately 11:00 p.m.

On December 17, a day after the eight initial search warrants had expired, the government applied for an extension (until December 26, 1984) of all eight warrants. The magistrate issued the extension, and, on December 20, agents seized various evidence and arrested the defendants at the Clearlake house. The defendants were charged with two violations of 21 U.S.C. § 841(a)(1) (1982) (possession of a controlled substance with intent to manufacture and distribute) and with one violation of 21 U.S.C. § 846 (1982) (conspiracy to violate § 841(a)(1)).

On May 6, 1985, the district court, pursuant to a motion to suppress, conducted a limited hearing on, first, the training and information given to DEA agents regarding the requirements for obtaining search warrants, second, the availability of alternatives to surreptitious entry in investigating a possible laboratory operation, and third, the danger of the chemicals used to make methamphetamine. Because the government questioned whether codefendants Walter Freitas and Jonny McClellan had standing,[1] the district court discussed the legality of only Raymond Freitas' search. Applying the "totality of the circumstances" test, the court found that the informant's tips had been reliable and that the magistrate had justifiably found probable cause to issue the December 12 warrant. The court also noted that, standing alone, the magistrate's "extension," on December 17, of the already expired December 12 warrants was not so improper as to render the warrants invalid. But, the court added, the real issue was not whether the extension itself was improper but instead whether the surreptitious entry (and the information gleaned from that entry) im-

---

**1.** The government withdrew its objection to Jonny McClellan's and Walter Freitas' standing in the motion to suppress, and the district court granted the two defendants' joinder in the motion to suppress on July 10, 1985.

permissibly tainted the December 17 warrant.[2] The court found that surreptitious entry warrants are neither valid under Rule 41 of the Fed.R.Crim.P. nor constitutionally permissible. In reaching the second of these conclusions, the court pointed out that, although Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1982) (the wiretap requirements), was not directly applicable, "its provisions give content to the minimum standards of the Fourth Amendment as applied to electronic surveillance, and by ... analogy, a surreptitious entry." 2 E.R. at 233. The Court held that *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), did not bar suppression. In denying the government's motion for reconsideration, the court reemphasized the lack of any notice provision in the surreptitious entry warrant and held that the lack of notice violated both Rule 41 and the Fourth Amendment.

The court found that the agents' reliance on the surreptitious entry warrant was objectively unreasonable within the meaning of *Leon* and *Sheppard, supra,* even assuming

> (1) that several of the agents involved in the application for the surreptitious entry warrant were aware at the time of the application that similar covert entries had been authorized by other magistrates in connection with a 1983 drug investigation in Oakland; (2) that the agents sought the advice of an Assistant United States Attorney, who approved the application for the warrant; (3) that the agents advised the magistrate who issued the warrant of its special nature; and (4) that "similar warrants" have been issued in other districts, including the Eastern District of California.

3 E.R. at 436. The court also applied the "independent source" rule and again rejected the government's assertion that the De-

cember 20 seizure of evidence was not tainted by the information obtained during the surreptitious entry. Finally, the court ordered a limited hearing to determine whether, under *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the evidence from the December 20 search and arrest was admissible under the "inevitable discovery" rule. At the hearing, the court held that the evidence would not inevitably have been discovered. Accordingly, the district court suppressed the evidence. The government appeals; we have jurisdiction under 18 U.S.C. § 3731 (1982).

## II.

### STANDARD OF REVIEW

 Questions of interpretation of the Federal Rules are reviewed de novo. *See, e.g., United States v. McClintock,* 748 F.2d 1278, 1287 (9th Cir.1984) (reviewing Fed. R. of Evid. de novo), *cert. denied,* —— U.S. ——, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985); *Harbeson v. Parke Davis, Inc.,* 746 F.2d 517, 520 (9th Cir.1984) (reviewing Fed. R.Civ.P. de novo). A warrant's facial validity is also reviewed de novo. *See McClintock,* 748 F.2d at 1282. The question of whether the agents' reliance on the warrant was objectively reasonable is a mixed question of fact and law to be given de novo review. *United States v. Hendricks,* 743 F.2d 653, 656 (9th Cir.1984) (citing *United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 382 (1985). Although normally the district court's determination of the questions of fact surrounding the warrants would be reviewed using the "clearly erroneous" standard, *see McConney,* 728 F.2d at 1200, here the district court *assumed,* for the sake of argument, that the government's facts were true. Therefore, it did not engage in the

**2.** The district court, citing *United States v. Fogarty,* 663 F.2d 928, 930 (9th Cir.1981) (per curiam), found that agent Hayes' affidavit was supported by the previous day's affidavit (agent Wood's affidavit) and that therefore the magistrate had enough information before him to find probable cause to issue the surreptitious entry warrant.

factfinding that is reviewed under the "clearly erroneous" standard.[3]

## III.

### DOES RULE 41, FED.R.CRIM.P., AUTHORIZE A WARRANT PERMITTING SURREPTITIOUS ENTRY?

■ The district court held that a search warrant permitting agents to observe, but not "seize," tangible property was impermissible under Rule 41. That holding conflicts with language in *United States v. New York Telephone Co.*, 434 U.S. 159, 169, 98 S.Ct. 364, 370, 54 L.Ed.2d 376 (1977):

> Although Rule 41(h) defines property "to include documents, books, papers and any other tangible objects," it does not restrict or purport to exhaustively enumerate all the items which may be seized pursuant to Rule 41. ... Rule 41 is not limited to tangible items....

*Id.* (quoting Fed.R.Crim.P. 41(h)). That case held "seizures" of intangibles were not precluded by the definition of "property" appearing in Rule 41(b). 434 U.S. at 170, 98 S.Ct. at 371 ("Rule 41 is sufficiently broad to include seizures of intangible items such as dial impulses recorded by pen registers...."); *cf. United States v. Kahn*, 415 U.S. 143, 154–55, 94 S.Ct. 977, 983–84, 39 L.Ed.2d 225 (1974) (reasonable seizure of conversations does not violate the Fourth Amendment).

Without doubt there was a "search" in this case. Its purpose, we hold, was "to seize" intangible, not tangible, property. The intangible property to be "seized" was information regarding the "status of the suspected clandestine methamphetamine laboratory." The search was authorized by a warrant supported by what the district court concluded was probable cause. We agree with that conclusion.

■ The question remains, however, whether a warrant lacking both a description of the property to be seized and a notice requirement conforms to Rule 41, Fed.R.Crim.P. Ordinarily it would not. Whether it does so under the facts of this case and the holding of *United States v. New York Telephone Co.* is the issue we confront. Two circumstances make this issue particularly difficult. The first is that although the warrant "excused [the agents] from leaving a copy of the inventory and return [notice] on the premises," it required the agents to furnish the magistrate with the inventory and return. 1 E.R. at 111. The second is that, although Freitas did not receive notice contemporaneous with the search, he and other defendants did receive notice within seven days of the search.[4]

The application of Rule 41 to searches for the purpose of seizing only information obviously requires substantial interpretation of its terms. The crucial question pertains to notice. In what manner should Rule 41(d) be applied to warrants authorizing clandestine entries? A return to the magistrate, as required by the warrant here, obviously provides a "return" that can be deemed to satisfy the return requirement of Rule 41(d). Similarly, reasonably prompt notice to the person whose premises were searched for information only might be deemed to supply the Rule's notice requirement. Because the adjustments to Rule 41 necessary to regulate surreptitious entries can better be accomplished by the rulemakers and Congress than by the case-by-case work of courts, we are reluctant to hold that the warrant in

---

**3.** If the district court had engaged in actual factfinding, this court could overturn the district court's findings only if "'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

**4.** *United States v. New York Telephone Co.*, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), noted that Rule 41 does not require notice to be given prior to the search. *Id.* at 169 n. 16, 98 S.Ct. at 371 n. 16. In this case, however, we are not concerned with the concepts of prior or contemporaneous notice; rather, our concern focuses on the issue of post-search notice.

**1456**

this case conformed to Rule 41(d). Therefore, we hold that there was no compliance with Rule 41 under the facts of this case.

■ The failure to comply with Rule 41 does not automatically require suppression of the property seized by way of the search. Assuming the search and seizure does not transgress the Fourth Amendment's commands, this court has held that suppression is required only where agents would not have carried out the search and seizure had they been required to follow the rule and where they "intentional[ly] and deliberate[ly] disregard[ed] ... a provision in the Rule." *United States v. Stefanson*, 648 F.2d 1231, 1235 (9th Cir.1981) (quoting *United States v. Radlick*, 581 F.2d 225, 228 (9th Cir.1978)). Application of this standard, however, may be unnecessary if the search and seizure was barred by the Fourth Amendment. We turn to that question.

### IV.

### APPLICATION OF THE FOURTH AMENDMENT TO THE SEARCH

The surreptitious character of the search and seizure in this case calls to mind wiretapping, which is now governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1982). The district court held that noncompliance both with Title III's notice provisions and with the "necessity for electronic surveillance requirement" existed in this case. Reasoning by analogy, the district court held the search and seizure violated the Fourth Amendment.

Despite the similarity of the problems presented by this case and wiretapping, Title III has been held to apply only to *aural* interception of communication, *see New York Telephone Co.*, 434 U.S. at 166–67, 98 S.Ct. at 369–70, and not to *visual* observations. Title III, however, does serve to make clear the probable constitutional importance of both the necessity for the surreptitious seizure and the subsequent notice.

With respect to a necessity requirement, the record before us fails to show that it was met. Perhaps it could have been but, viewing the record as a whole, we conclude that it merely demonstrates that the search and seizure would facilitate the investigation of Freitas, not that it was necessary. We hasten to add, however, that we do not hold that a showing of necessity is constitutionally required in a case such as is before us. We merely wish to point out that any such showing is lacking here and that, had such a showing been made, it could have strengthened the claim that the search and seizure in this case met the commands of the Fourth Amendment.

■ The absence of a notice requirement in the warrant presents a much more difficult issue. While it is clear that the Fourth Amendment does not prohibit all surreptitious entries, *see Dalia v. United States*, 441 U.S. 238, 247, 99 S.Ct. 1682, 1688, 60 L.Ed.2d 177 (1979), it is also clear that the absence of any notice requirement in the warrant casts strong doubt on its constitutional adequacy, *see Berger v. New York*, 388 U.S. 41, 60, 87 S.Ct. 1873, 1884, 18 L.Ed.2d 1040 (1967). We resolve those doubts by holding that in this case the warrant was constitutionally defective in failing to provide explicitly for notice within a reasonable, but short, time subsequent to the surreptitious entry. Such time should not exceed seven days except upon a strong showing of necessity.

We take this position because surreptitious searches and seizures of intangibles strike at the very heart of the interests protected by the Fourth Amendment. The mere thought of strangers walking through and visually examining the center of our privacy interest, our home, arouses our passion for freedom as does nothing else. That passion, the true source of the Fourth Amendment, demands that surreptitious entries be closely circumscribed. The warrants in this case failed to do so.

### V.

### THE GOOD FAITH EXCEPTION

■ It follows that the suppression order of the district court was proper insofar

as it rested upon the warrant's failure to comply with Rule 41 or the Fourth Amendment. We hold, however, that the district court erred in holding that on the basis of the actual and assumed facts the agents were not entitled to assert that their reliance on the warrant was objectively reasonable and that, as a consequence, the December 17 warrant was impermissibly tainted by the surreptitious search and seizure.

*United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), lists four circumstances in which an agent could not claim that his reliance on a warrant was objectively reasonable. The two relevant circumstances here are, first, if the affidavit upon which the warrant was issued was " 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,' " *id.* at 923, 104 S.Ct. at 3422 (quoting *Brown v. Illinois*, 422 U.S. 590, 611, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)), and second, if the warrant either "fail[ed] to particularize the place to be searched or the things to be seized," *id.* at 923, 104 S.Ct. at 3422. Neither of those circumstances is present in this case. The warrant described the place to be searched (Freitas' Clearlake residence) and the items to be observed (evidence of a drug laboratory), and the affidavit upon which the request for the warrant was based referred to that of the previous day (Dec. 12).

In the companion case to *Leon, Massachusetts v. Sheppard*, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), the Court described the type of behavior that would render an agent's reliance on an invalid warrant objectively reasonable. The detective in *Sheppard* showed his affidavit to the district attorney, and the district attorney approved it; the detective then gave the approved affidavit to a judge, who found that probable cause existed; the detective asked the judge to change the warrant form because the agent had not been able to find a copy of the correct form for the particular search requested, and the judge made some changes. *Id.* at 985–86,

104 S.Ct. at 3427. In fact, the Court went on to explain that, if "[a]n error of constitutional dimensions may have been committed with respect to the issuance of the warrant," the fault was the judge's and did not affect the determination of the *officer's* objective reasonableness. *Id.* at 990, 104 S.Ct. at 3429. Although the district court in this case assumed that the agents had heard of similiar surreptitious entry warrants issued elsewhere, that the agents had asked the advice of an Assistant U.S. Attorney, and that the agents discussed the surreptitious entry with the magistrate, it concluded that the agents' reliance on the warrant was objectively unreasonable. In light of *Sheppard*, this conclusion is incorrect. Furthermore, on the basis of those assumptions, "[t]his is not an instance in which 'it is plainly evident that a magistrate or judge had no business issuing a warrant,' " *id.* at 990 n. 7, 104 S.Ct. at 3429 n. 7 (quoting *Illinois v. Gates*, 462 U.S. 213, 264, 103 S.Ct. 2317, 2346, 76 L.Ed.2d 527 (1983) (White, J., concurring)). It follows if the facts support these assumptions, that the agents were objectively reasonable, that the December 17 warrant was valid, and that the suppression order was improper.

## VI.

### THE REMAND

Because the district court did not find, but merely assumed, certain crucial facts we deem essential to invoking the good faith exception, we must remand this case to the district court to permit it to make explicit findings with respect to these facts. The remand is limited, however. Should the district court make findings consistent with its four assumptions set forth at 3 E.R. 436–37, it should withdraw its order suppressing evidence of drug-related activity. Should the district court find one or more of these assumptions not supported by the facts, the good faith exception on the basis of *Leon* and *Sheppard* must be applied by the district court to the facts as they are found to be. The possibility of

suppression for violation of Rule 41 remains. We leave it to the district court to address that question independently. Its resolution, of course, should consider our analysis of Rule 41 as well as our holding that, under the facts it assumed, the agents' conduct did not violate the good-faith standard the Supreme Court erected in *Leon* and *Sheppard.*

REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.

POOLE, Circuit Judge, dissenting:

I respectfully dissent.

Although my colleagues of the majority are not known as the likely authors of a decision which distorts history, confounds precedent, and shuns the clear intent of the Fourth Amendment to the Constitution of the United States, this, despite my respect for them, is how I must term the defective product which they have imposed upon us. The majority has now put this court on record as approving a practice which is dangerous and offensive, violates the letter and spirit of the Constitution, and ignores the literal requirements of applicable provisions of the Federal Rules of Criminal Procedure.

The majority opinion upholds the issuance by a magistrate and the execution by law enforcement officers of a search warrant purporting to grant carte blanche authority to law enforcement officers to make stealthy entry at night into the private residence of a citizen (suspected of being about to manufacture a controlled substance), there to "look around" through the premises for indicia of crime from which to determine the most propitious time to return and "bust" the homeowner, and then to depart leaving no trace of their visit. They hoped further to secure additional information which might supply probable cause with which they might apply for the renewal of the expired and no longer valid search warrants. They had no warrants of arrest and so they came in nearing midnight, when no one was home. The "warrant" did not, as mandated by

Fed.R.Crim.P. 41(c)(1) and (c)(2)(E), particularize any property to be seized; it did not require an inventory of property taken to be left at the premises, as required by Rule 41(d); nor did it require the executing agents to endorse the exact time of execution (entry) on the face of the duplicate warrant, as required by Rule 41(c)(2)(F)—a means by which the householder could know that an entry had been made into his home, and know when it had occurred.

The authorization thus abusively employed by the agents is said to be acceptable because of their alleged good faith in making the entry. In truth, it constituted free-roaming, unsupervised license to cast entirely aside all vestige of the right to privacy which under our Constitution over the decades has been held the due of us all.

I find the procedures devised by the agents and accepted by the majority to be an unjustified deviation from principles of the laws of search and seizure with which I am familiar, and one which constitutes a dangerous and radical threat to civil rights and to the security of all our homes and persons.

### THE EVENTS

As the majority opinion relates, in July, 1984, an anonymous informant telephoned the Drug Enforcement Agency (DEA) and advised that appellant Raymond Freitas had a laboratory at his place in Clearlake, California, for the manufacture of methamphetamine, a controlled substance. A succession of additional calls from the (still-anonymous) informant advised that Freitas also had a home in Oakland, California, and that he employed a GMC truck to transport chemicals and glassware to the laboratory.

In October, deputy sheriffs at Clearlake observed and notified DEA of the existence of hoses running from Freitas' house into Clearlake, and that neighbors had reported strong odors around the house. The deputies recognized these as signs associated with the manufacturing of amphetamine. In several more calls, the informant said that Freitas would soon commence manu-

facturing the drug either at Clearlake or at a place north of Sacramento. Following another call from the informant about December 9, 1984, that Freitas was assembling equipment for the manufacturing process—this being information which coincided with the DEA agents' own surveillance—they witnessed him and others bring large quantities of ice into the Clearlake home.

With all the above information, including also the history that Freitas had been arrested in 1980 and charged with importing cocaine, and had been arrested again in 1982 for trying to involve his brother-in-law in the making of amphetamine, the agents applied on December 12 to a federal magistrate and were issued warrants to search both the Clearlake and the Oakland homes, and six additional warrants to search storage lockers. Fed.R.Crim.P. 41(c)(1) provides that a warrant must command the officer to make the search "within a specified period not to exceed 10 days." The magistrate here required the warrant for the homes to be executed within four days, by December 16. On December 13, the day after the warrants had been issued, one of the DEA agents applied for a new warrant which permitted "surreptitious entry" into the Clearlake house. As the majority opinion describes:

> Under the terms of this warrant, the agents were permitted to enter the home while no one else was there, look around, and leave without removing anything. The magistrate, in issuing the warrant, used a conventional warrant form, designed to comply with Rule 41, Fed.R. Crim.P., but crossed off two items: first, the description of property to be seized, and second, the requirement that copies of the warrant and an inventory of the property taken were to be left at the residence. The warrant contained no notice requirement. Agents executed the warrant on December 13, 1984, at approximately 11:00 p.m.

On December 17, a day after the eight initial search warrants had expired, the government applied for an extension (until December 26, 1984) of all eight warrants. The magistrate issued the exten-

sion, and, on December 20, agents seized various evidence and arrested the defendants at the Clearlake house. The defendants were charged with two violations of 21 U.S.C. § 841(a)(1) (1982) (possession of a controlled substance with intent to manufacture and distribute) and with one violation of 21 U.S.C. § 846 (1982) (possession of a controlled substance with intent to manufacture and distribute) and with one violation of 21 U.S.C. § 846 (1982) (conspiracy to violate § 841(a)(1)).

Maj. Op. at 1453.

## DISTRICT COURT ACTION

After a thorough hearing District Judge Eugene Lynch ordered suppression of the evidence obtained from the December 13th entry and the evidence obtained from the "extended" or renewed search warrants which had been executed on December 20th. His full and careful memorandum of decision is included in the excerpts of record (E.R.) at 215 and is reported in *United States v. Freitas*, 610 F.Supp. 1560 (N.D. Ca.1985). A Government motion for reconsideration was filed on July 12, 1985, E.R. 239, and was denied by the district court on August 27, 1985, E.R. 431.

The district court reasoned that although the agents had presented probable cause for issuance of the house search warrants, there was no constitutional justification for the issuance of the so-called "surreptitious entry" warrant, and therefore, the information gained from the December 17th entry must be suppressed. Moreover, since the original warrants had expired, and their post-mortem "extension" had been based, in part at least, upon the knowledge gained from the illegal entry, all was suppressible. Judge Lynch found that the surreptitious entry warrant in this case was invalid under the Constitution and contravenes the provisions of Rule 41 of the Federal Rules of Criminal Procedure. He found inapplicable the administration of the "good faith" revival concept adopted in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and *Massachu-*

*setts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), because there could be no objectively reasonable reliance on a warrant which on its face set forth no thing or person to be seized, in defiance of the express requirements of that rule of criminal procedure—Rule 41—which should be the "Bible" of law enforcement officers in seeking search warrants, in absence of all of which there could hardly be compliance with the express command of the Fourth Amendment.

## STANDARD OF REVIEW

The majority opinion states, incorrectly, in my view, that the district court's determination of fact surrounding the warrants is not to be viewed under the clearly erroneous standard because "here the district court *assumed,* for the sake of argument, that the Government's facts were true. Therefore, it did not engage in the fact finding that is reviewed under the 'clearly erroneous standard.'" At 1454–1455. This conclusion is not correct and appears to have been based entirely on statements contained in the court's order denying reconsideration, not on the order in which Judge Lynch originally granted the suppression.

Judge Lynch conducted an evidentiary hearing to determine the agents' training, experience and familiarity with the problems presented by this kind of warrant, and their understanding of "techniques commonly relied upon in the investigation of clandestine drug labs." Suppression order of June 14, 1985, E.R. 235–238; *United States v. Freitas,* 610 F.Supp. at 1571–73. This included much of the matter contained in the affidavits for search warrants presented to the magistrate by Agents Steven Wood, E.R. 88, and the affidavits of Agents Laura Hayes and Steven Wood in support of motion for extension of time for the execution of the December 12, 1984 search warrants. E.R. 113–154.

In holding that the district judge did not weigh the facts but only assumed the truth of the Government's claims, the majority fell into error because the slip opinion appears to rely only on the proceedings conducted on the Government's motion for reconsideration. The court's plenary findings and conclusions (quite properly set forth by way of memorandum opinion, *see* Fed.R.Civ.P. 52(a)), were filed on June 14, 1985, whereas the proceedings and order denying reconsideration did not take place until August 27–29, 1985. Although the district court described the hearing as "limited," *United States v. Freitas,* 610 F.Supp. at 1572, it was in fact a lengthy hearing covering 76 pages of the reporter's transcript and appears in E.R. volume II immediately following the June 14 order granting suppression.

Based upon all the evidence, live testimony, exhibits and affidavits, the district court reached the findings and conclusions which the majority opinion seems not to have considered. Following the entry on August 29 of the order denying reconsideration, the government recalled Agent Wood and was permitted to elicit testimony from him on the issue of objective reasonableness. Agent Wood's declaration, dated July 3, 1985, (three weeks after the court had filed its suppression order) was allowed into evidence except for conclusionary paragraphs 3 and 6. E.R. 332–333. In it Agent Wood said that he knew that there had at one time been issued a surreptitious entry warrant in Oakland. He further said that the agents decided to apply for a covert entry warrant because "this would enable us to maintain the secrecy of the investigation and also confirm to a certainty our probable cause information that a lab was present."

I believe the majority is simply incorrect in concluding that the district judge merely assumed the truth of the Government's assertion and did not weigh the facts of reasonableness.

## FAILURE TO COMPLY WITH RULE 41

The majority opinion frankly says that "we hold that there was *no* compliance with Rule 41 under the facts of this case." At 1456. (Emphasis supplied). Then it states:

The failure to comply with Rule 41 does not automatically require suppression of the property seized by way of the search. Assuming the search and seizure does not transgress the Fourth Amendment's commands, this court has held that suppression is required only where agents would not have carried out the search and seizure had they been required to follow the rule and where they "intentional[ly] and deliberate[ly] disregard[ed] ... a provision in the Rule." *United States v. Stefanson,* 648 F.2d 1231, 1235 (9th Cir.1981) (quoting *United States v. Radlick,* 581 F.2d 225, 228 (9th Cir. 1978)). Application of this standard, however, may be unnecessary if the search and seizure was barred by the Fourth Amendment.

In *United States v. New York Telephone Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), the FBI applied for and the district court issued (1) a warrant authorizing the installation of a pen register based on probable cause, and (2) an order requiring the telephone company to lend its assistance in installing the device. The company contended that such an order could only be issued in connection with a wiretap order under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520. The district court ruled that Title III did not apply to the issuance of the warrant, nor did Rule 41. On appeal, the Second Circuit affirmed the warrant order but reversed as to the order of assistance.

The Supreme Court granted certiorari and held that Rule 41's definition of the "property" to be seized was not all inclusive; that the seizure of an "intangible" was not restricted; and that Title III did not apply because a pen register is not a wiretap; it is not an "interception" of a wire or aural communication because it does not acquire the "contents of communications," as defined in Title III. The court said that "Congress did not view pen registers as posing a threat to privacy of the same dimension" [as wiretaps] and did not intend to impose Title III restrictions upon their use." *Id.* at 168, 98 S.Ct. at 370. Basically, the Court's analysis was that

Rule 41 "authorizes the use of pen registers *under appropriate circumstances*" when viewed in connection with Fed.R. Crim.P. 57(b), which reads: "If no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules or with any applicable statute." *New York Telephone Co.,* 434 U.S. at 170, 98 S.Ct. at 371 (emphasis supplied). The reference to "appropriate circumstances" in the Supreme Court's decision is made clear by the following:

> We also agree with the Court of Appeals that the District Court had power to authorize the installation of the pen registers. It is undisputed that the order in this case was predicated upon a proper finding of probable cause, and no claim is made that it was in any way inconsistent with the Fourth Amendment.

*Id.* at 168–169, 98 S.Ct. at 370. To the extent that the district court suggested that a search for "intangibles" is of itself inconsistent with Rule 41, the above holding is now dispositive.

But the important element of the Supreme Court's above rationale is the predicate that the warrant be not inconsistent with the Fourth Amendment as detailed in Rule 41. Therein lies the fatal flaw in this case. Indeed, the majority candidly rules that "there was no compliance with Rule 41 here." But it then proceeds to find the seeds of objective good faith reliance under *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984).

I will not engage in carping here about the precise formulation or scope of the "good faith" and "objectively reasonable reliance" concepts on which the Supreme Court has informed us. The majority particularly rests on *Massachusetts v. Sheppard* in its search for an umbrella to shield the conduct of the agents in this case. But *Sheppard* is of a distinctly different mix than the facts of this case.

In *Sheppard,* a woman was found dead by violence. Her boyfriend was a suspect although he gave an alibi. Based upon undoubted probable cause, an officer, Detective O'Malley, sought a warrant to search Sheppard's residence. He prepared an affidavit which set forth with particularity the items sought, each of which clearly was of high evidentiary significance. The local District Attorney, his First Assistant, and a police sergeant all agreed that probable cause was shown. But it was Sunday and the court was closed. Nonetheless a warrant application form was found of a type in use in that locality. It was useful except that it was imprinted to be used in drug raids. The subtitle styled, "Search Warrant—Controlled Substance [with Statutory Citation]." The reference to controlled substance was typed out in the title but not in the body of the warrant itself. O'Malley found a judge, who read the affidavit and said he would sign the warrant. He took the warrant, made some changes, dated and signed it. He did not however eliminate the substantive print authorizing search for drugs. He then told O'Malley that the warrant as delivered was valid as to form and content. A search was made, incriminating items were seized and Sheppard was charged with murder.

A trial judge refused suppression because notwithstanding the defect, the police had in good faith believed themselves to be executing a valid warrant. Sheppard was convicted.

Although a plurality of the justices of the Supreme Judicial Court of Massachusetts found a reasonable good faith belief on part of the police they reversed the conviction because the state had not recognized the good faith exception. The Supreme Court granted certiorari. Justice White's opinion focused on "whether there was an objectively reasonable basis for the officers, mistaken belief." *United States v. Sheppard,* 468 U.S. 981, 988, 104 S.Ct. 3424, 3428, 82 L.Ed.2d 737. The majority of the Court found such to be present. The significance of this case is clear. The affidavit was particular and indisputably sufficient for probable cause. The officer could

only find a warrant for the search of controlled substances, one in which the object of the search is imprinted. He tried to make the warrant conform to the needs of the intended search by typing out some of its inappropriate recitals and told the judge that the document might have to be changed. *Id.* at 989, 104 S.Ct. at 3429. "He was told by the judge that the necessary changes would be made. He then observed the judge make some changes and received the warrant and the affidavit." *Id.,* 468 U.S. at 989, 104 S.Ct. at 3429. The opinion of the Court found the police conduct "objectively reasonable and largely error-free. An error of constitutional dimensions may have been committed with respect to the issuance of the warrant, but it was the judge, not the police officers, who made the critical mistake." *Id.,* 468 at 990, 104 S.Ct. at 3429.

The officers here were under no such mistaken belief. It was not the magistrate who crafted the warrant, and the agents were under no mistaken belief when they asked the magistrate to delete the notice requirement, as the Government admits. Govt.Br. at 36. Unlike the detective in *Sheppard,* the agents called the tune and decided that the warrant would expressly ignore the requirements of Rule 41. The magistrate went along. He said he had never issued such a warrant before. In *Sheppard* the officer relied upon the judge. Here, the magistrate relied upon the agents, thereby abandoning his proper role as a "neutral and detached" (and also minimally knowledgeable) judicial official with respect to the requirements of a warrant.

The majority here concede that Rule 41 was breached and the district judge found that it was intentionally done. It was not that the agents were in doubt whether notice was required by the rule: they knew full well that it was, but they said that they wanted to "maintain the secrecy of the investigation." Decl. of Wood. E.R. 332. This was a deliberate and knowing evasion of the Rule. The Government's argument that this was only an "administrative" requirement anyhow is simply not worthy of further comment. The argument that, in some cases, notice can be given after exe-

cution of the warrant, is likewise hollow. The Government archly states that "Notice of the covert entry, by way of discovery, was in defense hands *within 30 days*." Govt.Br. at 21 (emphasis supplied).

It seems to me that if this court lets stand the procedure called "surreptitious entry," as practiced in this case, these will have been delivered into the unfettered hands of the police an enormous instrumentality for invasion of the rights of privacy, rights of security, and protection from those in position of power who would have access to such awesome means of oppression. I cannot believe that the tocsin of alarm emanating from cases like this will go unheeded. A purported "good faith" belief which, in essence, is that it is not very important to honor the "right to be let alone" except where intrusion is necessary for protection of other values, simply cannot be sanctioned.

I would hold that, on the clear record of this case, the district court was not clearly erroneous in its finding that the agents committed a deliberate by-pass of the rule which implements the Fourth Amendment; that there is no need for remand; and that the district court judgment should be affirmed.